23-02879MB

# AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

Your affiant, Argelia G. Blair, Border Patrol Agent of the United States Border Patrol, being duly sworn, does depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I, Argelia G. Blair, am a Border Patrol Agent with the United States Department of Homeland Security (DHS), United States Border Patrol (USBP), and have been since April 2005. I completed the USBP Academy in September 2005. There, I received instruction in constitutional, immigration, and criminal law as well as federal and civil statutes. I have also received instruction in the detection, interdiction, and arrest of narcotics smugglers, alien smugglers, and aliens illegally present in the United States.

2. I have been assigned as a case agent to the Tucson Sector Prosecution Unit for approximately ten years. I have conducted investigations involving illicit activity, and I have gathered and structured evidence and facts pertaining to administrative and criminal cases. I routinely perform record checks through various law enforcement databases to establish accuracy of information as well as to gather facts further relevant to a respective case. I have acted as a liaison between the United States Attorney's Office and field agents, and I have assisted fellow agents in the development of their cases. The statements contained in this affidavit are based on information provided by fellow Border Patrol Agents and on my experience as a Border Patrol Agent in the USBP. Since this affidavit is submitted for the limited purpose of securing a search warrant, I have not included all facts known to me regarding this investigation. I have set forth facts that establish probable cause to believe

that the suspect/defendant referred to in this investigation conspired with other known and unknown individuals, wherein they jointly facilitated, either verbally or electronically, the trafficking of undocumented non-citizens into and within the United States. This affidavit is intended to show only that there exists sufficient probable cause for the requested warrant and does not portray all my knowledge about this matter.

3.   Through my training and experience as a USBP, I have learned that the utilization of cellular phones to communicate between coordinators, foot guides, load drivers, stash house operators, etc., is the most common form of communication.  When examining cellular phones, you can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications, and voice mail communications between the person who possessed or used the device and others.  It is quite common for navigational coordinates to also be transmitted to and/or from these devices to determine the user's location through a GPS application to allow for tracking of aliens and/or confirm current location.  In many areas of the border, scouts use phones to guide the groups to the pickup locations.  This allows the guides to maintain a safe distance and isolate themselves from the group and thus evade apprehension.  Sometimes these guides are in Mexico, other times in the United States. Drivers of scout vehicles are able to relay information to the driver of the load vehicle either with a direct call or with cellular programs called applications ("app") such as WhatsApp, with its End-to-End Encryption which

provides an added security feature that is very difficult to break, allows a cellular phone to function like a walkie talkie. Through this app, scouts will relay information such as the presence of Border Patrol or other Law Enforcement Officials. Drivers can also be guided by "pin drops" on apps such as Google Maps which will contain directions for the load vehicle. Alien Smuggling Organizations (ASOs) will utilize several different apps and functions on their phones to facilitate the coordination of a smuggling event.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4. The property to be searched consists of six cellular phones: a black Motorola cellular phone bearing IMEI:357852520808752, and FCC ID: 1HDT56Zx2, is sealed inside DHS Evidence Bag #6318816 (TARGET DEVICE 1 "TD1"); a purple Motorola cellular phone sealed inside DHS Evidence Bag #A6318819 (TARGET DEVICE 2 "TD2"); a black Apple cell phone sealed inside DHS Bag #A6318815 (TARGET DEVICE 3 "TD3"); a blue Xiamoi cellular phone, Model 21061119AL, bearing IMEI: 862389052008640, is sealed inside DHS Evidence Bag #A6318817 (TARGET DEVICE 4 "TD4"); a blue Huawei cellular phone, is sealed inside DHS Evidence Bag #A6318818 (TARGET DEVICE 5 "TD5"); and a purple Huawei cellular phone sealed inside DHS Evidence Bag #A6318824 (TARGET DEVICE 6 "TD6"). Theses phones are collectively referred to as the **Target Phones**. The **Target Phones** are secured inside the Tucson Border Patrol Station Seized Property vault in Tucson, Arizona. The **Target Phones** are sealed in DHS Evidence bags with a signed Form 6051S Custody Receipt for Seized Property and Evidence.

5. The requested warrant would authorize the forensic examination of the **Target Phones** for the purpose of identifying electronically stored data, to include: any telephone

numbers, including but not limited to numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically stored voice and text messages, calling card numbers, text messages, photos, videos and/or identifying information that may be stored in the memory of the Target Phone, for items described in Attachment A (incorporated herein by reference).

## PROBABLE CAUSE

6.    On July 22, 2022, at approximately 9:00 p.m., a USBP Agent (BPA) operating the dispatch radio advised that an unaccompanied trail camera near mile one on Federal Route 19 (FR19) had images of three suspected undocumented non-citizens at a location commonly known for alien smuggling known as Smith Ranch. FR19 is a rural road within the Tohono O'odham Nation south of Sells, Arizona that runs north and south from the United States and Mexico international boundary fence before connecting with State Route 86. Within the USBP Three Points Area of Operation, FR19 is the only paved road running north to south. This area of FR19 has a high volume of alien and narcotics smuggling by transnational criminal organizations who can easily transport undocumented non-citizens with vehicles straight north on FR19 further into the United States. Immediately after, a BPA operating a Mobile Surveillance Capability Truck (MSC) advised that he had visual of the three undocumented non-citizens wearing camouflage clothing crossing the road near the location of the camera and heading east towards another commonly known location for alien smuggling.

7.    BPA Amado Ordonez operating the Integrated Fixed Tower system stated that he had visual of three suspected undocumented non-citizens crossing the road. BPA Caleb Ritchie

started driving towards the location. Minutes later, BPA Ordonez advised that the suspected undocumented non-citizens ran towards an abandoned house, where he then lost visual. A few seconds later, BPA Ordonez saw a Sports Utility Vehicle (SUV) driving west from the area where the group was last seen. At this time BPA Ritchie arrived at the driveway to the abandoned house and saw a grey SUV with a temporary paper license plate driving west towards FR19. BPA Ritchie drove past the vehicle in the driveway and then turned around off the road and got behind the vehicle as it headed north on FR19.

8.  BPA Ritchie observed the SUV, which was a GMC Yukon, had very dark window tint that made it impossible to view how many people were inside the vehicle at night. While driving northbound on FR19 the SUV slowed to a speed of 35 miles per hour (MPH) on a paved road with a speed limit of 55 MPH and continued at this speed the entire time. BPA Ritchie continued to follow the SUV at this speed without emergency lights or sirens on. BPA Ritchie initiated a vehicle stop on the SUV at Mile Marker (MM) 4.5.

9.  BPA Ritchie initiated his marked service vehicle's emergency lights and siren to pull over the SUV. BPA Ritchie exited his vehicle and walked towards the driver side of the vehicle. BPA Blair walked towards the passenger side of the vehicle. BPA Ritchie identified the driver as Amanda Marie HAVIER, a United States Citizen. Amanda Marie HAVIER had both hands up and out of the window and advised BPA Ritchie that she hit a horse and was traveling northbound from her father's residence, the abandoned house near MM 1 on FR19. BPA Ritchie shined his flashlight into the open driver's window and noticed a person with thin lightweight camouflage pants, curled up and hiding behind the driver's seat as well as two other people in the back wearing camouflage pants.

10.     BPA Ritchie instructed Amanda Marie HAVIER to exit the vehicle. BPA Ritchie saw three people all wearing camouflage pants and camouflage carpet shoe covers sitting in a curled position behind the driver's seat, and a fourth not wearing camouflage. The fourth person in the rear passenger area was wearing blue jeans and a blue button up shirt. This subject was sitting behind the passenger seat. Based on my training and experience, the camouflage clothing is a very common tactic used by people trying to evade law enforcement as they travel through the desert after crossing the border. Carpet shoes are another common tactic used to evade authorities by masking their footprints. The subject seated in the seat behind the driver's seat and wearing camouflage was identified as Rafael DEPAZ-Sel. The subject seated in the middle seat behind the center console and wearing camouflage was identified as Rosalia PEREZ-Jose, and the third subject laying on the floor near the feet of the other two subjects was identified as Gisela LORENZO-Hernandez. These three individuals were later identified as undocumented non-citizens. Two were determined to be citizens and nationals of Mexico and one was a citizen and national of Guatemala without legal authorization to be present in the United States. The fourth person not wearing camouflage was identified as Justin LOPEZ, a United States Citizens. LOPEZ was older and quite frail. Amanda HAVIER, Shina HAVIER and Justin LOPEZ stated that they were all related. LOPEZ uncle to Amanda HAVIER, who was the mother to Shina HAVIER, an adult female who was the front seat passenger. Amanda HAVIER, Shina Havier, and Justin LOPEZ were all determined to be United States citizens and members of the Tohono O'odham Nation.

11.     Amanda Marie HAVIER stated to agents that they were at the abandoned residence

to visit relatives and while at the residence three unknown people approached them and asked for a ride. Amanda Marie HAVIER stated that she felt bad for the people and offered them a ride to an unknown destination and stated that no monetary transaction had occurred. Amanda HAVIER, Shina HAVIER, and Justin LOPEZ all made no further statements to agents.

12. "TD1" was seized from Amanda Marie HAVIER, "TD2" was seized from Rafael DEPAZ-Sel, "TD3" was seized from Shina HAVIER, "TD4" was seized from Rosalia PEREZ-Jose, "TD5" was seized from Rosalia PEREZ-Jose, and "TD6" was seized from Gisela LORENZO-Hernandez.

13. Since the date of the arrest, the **Target Phones** have been held in evidence with the USBP. The **Target Phone**s have been stored in such a manner that their contents, to the best of my knowledge, are in substantially the same state as when it first came into possession of the USBP.

14. Amanda Marie HAVIER was placed under arrest for Transportation of Illegal Aliens. Upon detention, Amanda Marie HAVIER had one cellular phone on her possession "TD1." The remaining **Target Phones** were seized as part of this investigation and have been in USBP custody since that time.

15. The three undocumented non-citizens were interviewed by agents. Rafael DEPAZ-Sel stated that they were instructed by a guide via a cell phone to wait close to the load up location due to the heavy presence of Border Patrol. DEPAZ stated that he was told that a vehicle would arrive at the pick-up location. DEPAZ stated that a grey four door GMC Yukon arrived at the location to pick them up. DEPAZ stated that the driver told them to get into the

vehicle and opened the doors of the vehicle for them and they left. DEPAZ stated that before Amanda Marie HAVIER was arrested, she said something to the effect of "now it is all ruined".

16.     Rosalia PEREZ-Jose stated that they waited three days near the pick-up location due to the heavy presence of Border Patrol being in the area where they were going to get picked up. PEREZ stated that they were instructed by cell phone to go to the pickup location sent through cell phone where a grey vehicle would be waiting for them. PEREZ stated that the driver and two more people arrived at the load up location to pick them in a grey four-door GMC Yukon. PEREZ stated that the driver signaled them with her hand and instructed them to get into the vehicle and the left.

17.     Gisela LORENZO -Hernandez stated that they walked for approximately two hours and were being guided by cell phone by a guide in Mexico which gave them updated locations to where to keep walking to until they arrived at the load up location. LORENO stated that they waited three days near the pick-up location due to the heavy presence of Border Patrol being in the area where they were going to get picked up. LORENZO stated that they then were instructed by cell phone to go to the pickup location sent through cell phone where a vehicle would be waiting for them. LORENZO stated that once they were near the vehicle, the driver turned the vehicle head lights on and off and they ran towards the vehicle.

18.     Based on the totality of the circumstances; time of night, the rural remote location, that FR19 is commonly used area for smuggling, the driving behavior of Amanda HAVIER, the statements of Amanda HAVIER and the three undocumented non-citizens, I believe that probable cause has been established that the **Target Phones** contain evidence of a conspiracy

to smuggle undocumented non-citizens within the United States by containing communication with members of the conspiracy regarding the smuggling event on the **Target Phones**.

## TECHNICAL TERMS

19. Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

20. Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable

storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

21. Portable media player. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

22. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

23.     Based on my training, experience, research, and from consulting the manufacturer's advertisements and product technical specifications available online for these types of cellular phones, and based upon my discussions with experts, I know that the cellular phones which are the subject of this search warrant application most likely have capabilities that allow them to also serve as a radio communication transmitter, wireless telephone, GPS device, wireless internet connectivity, and text message capabilities, as these are generally standard features. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24.     Based on my knowledge, training, and experience, I know that electronic devices such as the **Target Phones** in this case, can store information for long periods of time. Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person

"deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

25. As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Phones** were used, where they were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the **Target Phones** is more fully set forth in the factual section contained herein and because:

   A. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

   B. Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   C. A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   D. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic

process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of the **Target Phones** did not have a relationship with the party.

## **CONCLUSION**

26. Based on the foregoing information, there is probable cause to believe that the **Target Phones** contain evidence related to a conspiracy to smuggle undocumented non-citizens within the United States in violation of 8 U.S.C. § 1324.

27. The examination of the **Target Phones** may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Because this warrant only seeks permission to examine devices already in the possession of the Border Patrol, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night. The aforementioned **Target Phones** have been properly

stored at the Tucson Border Patrol Station Seized Property vault in Tucson, Arizona and is being transferred to the Tucson Sector Prosecutions Office. Due to the nature of such cell phones, data contained within will remain uncorrupted when being stored for an extended period of time. Therefore, I request that a warrant be issued, allowing for the search of the **Target Phones**, as described above.

_____
argelia.g.blair@cbp.dhs.gov
Digitally signed by argelia.g.blair@cbp.dhs.gov
Date: 2023.03.10 10:08:45 -07'00'

Argelia G. Blair, Border Patrol Agent
United States Border Patrol
.

Subscribed and sworn to telephonically
this 10th day of March, 2023.

_____
Honorable Leslie A. Bowman
United States Magistrate Judge

23-02879MB

ATTACHMENT A

ITEMS TO BE SEARCHED

A Motorola cellular phone (black in color), Model XT2163DL, bearing IMEI:357852520808752, and FCC ID: 1HDT56ZX2, is sealed inside Department of Homeland Security Evidence Bag # A6318816, the "**TD1**" The **Target Phone** was seized from Amanda Marie HAVIER at the time of the arrest. The **Target Phone** is currently secured at the Tucson Border Patrol Station, 2430 S. Swan Road, Tucson, Arizona, 85711. The **Target Phone** is sealed in a Department of Homeland Security Evidence Bag #A6318816 with a signed Form 6051S Custody Receipt for Seized Property and Evidence.

A Motorola cellular phone (purple in color), is sealed inside Department of Homeland Security Evidence Bag #A6318819, the "**TD2**." The **Target Phone** was seized from Rafael Roman DEPAZ-Sel at the time of the arrest. The **Target Phone** is currently secured at the Tucson Border Patrol Station, 2430 S. Swan Road, Tucson, Arizona, 85711. The **Target Phone** is sealed in a Department of Homeland Security Evidence Bag #A6318819 with a signed Form 6051S Custody Receipt for Seized Property and Evidence.

An Apple cellular phone (black in color), is sealed inside Department of Homeland Security Evidence Bag #A6318815, the "**TD3**." The **Target Phone** was seized from Shina HAVIER at the time of the arrest. The **Target Phone** is currently secured at the Tucson Border Patrol Station, 2430 S. Swan Road, Tucson, Arizona, 85711. The **Target Phone** is sealed in a

Department of Homeland Security Evidence Bag #A6318815 with a signed Form 6051S Custody Receipt for Seized Property and Evidence.

A Xiamoi cellular phone (blue in color), Model 21061119AL, and bearing IMEI: 862389052008640, is sealed inside Department of Homeland Security Evidence Bag #A6318817, the "**TD4**." The **Target Phone** was seized from Rosalia PEREZ-Jose at the time of the arrest. The **Target Phone** is currently secured at the Tucson Border Patrol Station, 2430 S. Swan Road, Tucson, Arizona, 85711. The **Target Phone** is sealed in a Department of Homeland Security Evidence Bag #A6318817 with a signed Form 6051S Custody Receipt for Seized Property and Evidence.

A Huawei cellular phone (blue in color), is sealed inside Department of Homeland Security Evidence Bag #A6318818, the "**TD5**." The **Target Phone** was seized from Rosalia PEREZ-Jose at the time of the arrest. The **Target Phone** is currently secured at the Tucson Border Patrol Station, 2430 S. Swan Road, Tucson, Arizona, 85711. The **Target Phone** is sealed in a Department of Homeland Security Evidence Bag #A6318818 with a signed Form 6051S Custody Receipt for Seized Property and Evidence.

A Huawei cellular phone (purple in color), is sealed inside Department of Homeland Security Evidence Bag #A6318824, the "**TD6**." The **Target Phone** was seized from Gisela LORENZO-Hernandez at the time of the arrest. The **Target Phone** is currently secured at the Tucson Border Patrol Station, 2430 S. Swan Road, Tucson, Arizona, 85711. The

**Target Phone** is sealed in a Department of Homeland Security Evidence Bag #A6318824 with a signed Form 6051S Custody Receipt for Seized Property and Evidence.

ATTACHMENT B

ITEMS TO BE SEIZED

1. Data and/or digital files stored on or accessed through the Target Phone (as described in Attachment A) relating to alien smuggling, wherever it may be stored or found, specifically including:

    a. names of person(s) smuggled, pick up and drop off points for human smuggling, numbers of people to be smuggled, and dates/places where human smuggling took place;

    b. information relating to payments for human smuggling, including: amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered as well as dates, places, exchange rates, and amounts tendered for specific transactions;

    c. any information related to sources of money funding human smuggling (including names, account numbers and/or payment account names (e.g. PayPal, Zelle, etc…) addresses, phone numbers, or any other identifying information);

    d. all bank records, checks, credit card bills, account information, and other financial records that are related to human smuggling.

2. Electronic correspondence stored on or accessed through the Target Phones relating to alien smuggling, to include emails and attached files, text messages, instant messaging logs, and any electronic messaging used to identify pick up and drop off points (e.g. mapping applications such as Google Maps).

3. Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through the Target Phones.

4. Contact lists stored on or accessed through the Target Phones, to include telephone and email contact names, telephone numbers, addresses, and email addresses.

5. Evidence of persons who used, owned, or controlled the Target Phones.

6. Logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs,

photographs, electronic correspondence, and telephone contact lists stored on or accessed through the Target Phones.